150

## CIRCUIT COURT OF THE CITY OF STAUNTON

Wanda D. Meeks,
Administrator
of the Estate of
Jody Hilton Swisher

v.

Richard G. Broschinski

September 25, 2003

BY JUDGE HUMES J. FRANKLIN, JR.

In the case of *Meeks v. Broschinski*, Defendant, employee of the City of Staunton, Virginia's emergency personnel,[1] invokes the public duty doctrine as a defense to Plaintiff's negligence claim against Defendant for his alleged failure to provide emergency medical services to Plaintiff following Defendant's receipt of a 911 call reporting a suspected hit-and-run accident in Staunton, Virginia, on August 25, 2001. Whether the public duty doctrine shields Defendant from liability is a complicated matter that invokes both legal doctrines and public policy concerns.

The public duty doctrine asks whether a defendant owes a duty to the citizenry at large or whether a defendant owes a special duty to a specific identifiable person or class of persons. Only a violation of the latter duty will give rise to civil liability of the official. *Marshall v. Winston*, 239 Va. 315, 319 (1990). Thus, to determine whether Defendant can protect himself from liability under the public duty doctrine, the Court must analyze two issues: (1) whether Plaintiff is a specific identifiable person or member of a class of

---

[1] Va. Code § 18.2-426: "Emergency personnel means any persons, paid or volunteer, who receive calls for dispatch of police, fire, or emergency medical service personnel, and includes law-enforcement officers, firefighters, including special forest wardens designated pursuant to § 10.1-1135, and emergency medical service personnel."

persons to whom Defendant owes a special duty of care and (2) whether a special relationship exists between Plaintiff and Defendant that creates a special duty of care.

### Was Plaintiff a Member of a Class of Persons or the Citizenry at Large?

Because the identity of Plaintiff was unknown on the night in question, to cross the first hurdle of the public duty doctrine, he must show that he is a member of a class of persons to whom Defendant owes a special duty of care. To establish oneself as a member of a discernable class of persons, Plaintiff must distinguish himself from the general public. *Mpras v. Community Living Alternatives*, 35 Va. 264, 267 (1994). For instance, in the case of *Dudley v. Offender Aid and Restoration*, the Virginia Supreme Court recognized the victim as a member of a class consisting of those persons "within a given area of danger." 241 Va. at 279. Thus, the class of person need not be defined by race, sex, or residency. Rather a class of persons may be somewhat fluid, but still identifiable; had the victim in *Dudley* not lived near her attacker she would not have been a member of the class of persons within the zone of danger.

On the night in question, Plaintiff was not part of the general public, rather he was a person in need of emergency services and thus a member of such class. Plaintiff had been struck by a moving automobile with such force that the car's windshield had shattered and Plaintiff's blood stained the car. The evidence from the car alone makes evident that Plaintiff required emergency medical assistance and, as such, was member of a class of persons discernable from the community at large.

Defendant contests this classification and relies on the holdings of neighboring jurisdictions that have held 911 dispatchers to be immune from negligence suits under the public duty doctrine.[2] Specifically, Defendant relies heavily on the holding in *Muthukumarana v. Montgomery County, Maryland*, 370 Md. 447 (2002). In *Muthukumarana*, the Court of Appeals of Maryland addressed the liability of 911 dispatchers stemming from two different incidents. In one incident, the dispatcher provided an incorrect address to the emergency response team, and, in the other situation, the dispatcher did not suggest the caller flee the home and call again from a safer location rather than

---

[2] Virginia has not addressed the liability of 911 dispatchers specifically. Thus, Defendant relies on the holdings of state courts in Maryland, Washington, D.C., and West Virginia that granted 911 dispatchers immunity from negligence suits in accordance with the public duty doctrine.

remain on the phone in the presence of her violent husband. *Id.* at 457-69. The Maryland court equated the 911 dispatchers to police officers and held they have a *public duty* to aid rather than a specific duty to aid particular persons or classes of persons. *Id.* at 490. The Maryland court relied heavily on public policy concerns to make its decision and emphasized that to impose liability on such dispatchers who were executing their duties as they saw fit would cause greater harm than good. The Maryland court foresaw vast amounts of litigation against emergency response dispatchers due to disagreements on how best to handle emergency situations and feared that such litigation costs would subtract from the limited funds available to provide such necessary emergency services. Thus, the Maryland court found neither defendant 911 dispatcher liable for the wrongful deaths of the victims.

However, the holding in *Muthukumarana* is distinguishable from the case at hand. In *Muthukumarana*, both defendants dispatched emergency crews to the scenes of the emergencies (or to a nearby location) in response to the calls and each caller followed appropriate protocol in handling the incoming calls. *Muthukumarana*, 370 Md. at 396-98. In the case at hand, Defendant did not follow Call Prioritization procedures;[3] he did not dispatch an emergency response team to investigate the situation described by the caller; and, at the very least, he did not mention the uncertain call to his supervisor or co-workers to better analyze the validity of the call. Furthermore, given the sensitivity of the responsibilities of 911 dispatchers and the reliance that persons in need place in such workers, it would be arbitrary for this Court, like the Court of Appeals of Maryland, to make a general statement that 911 dispatchers are protected from liability under the public duty doctrine. The principles of justice are far better served on a case by case basis than by a one-size-fits-all analysis. "In every case, it is for the court to determine, as a question of law, from all the circumstances, if it is controverted, whether the plaintiff falls within the class of those to whom the defendant owes a duty." *Dudley v. Offender Aid and Restoration of Richmond*, 241 Va. 270, 279 (1991).

Still, Defendant may argue that, like police officers and firefighters, emergency dispatchers serve the public at large and not solely those in need of emergency services. Defendant's analogy is strong. Emergency dispatchers assist police officers and firefighters in carrying out their duties to protect citizens in general. Dispatchers are the link in the chain of emergency response services, and, as such, some courts afford them the same immunity

---

[3] Testimony of Police Chief of Staunton City Police Department familiar with emergency procedures, Hearing on Motion to Dismiss, Aug. 21, 2003.

from suit as provided police officers. However, one fine-line distinction between police officers and emergency dispatchers is that dispatchers work in a responsive capacity, while police officers are obligated to work in both affirmative and responsive capacities. Specifically, when on duty, police officers must be alert to their surroundings and must act proactively to prevent crime and reactively to stop or respond to the report of a crime. As such, the primary responsibility of police officers is to actively protect the public at large. On the contrary, the duties of emergency dispatchers are completely reactionary. They await calls from persons in need of prompt assistance. Once such call is received, a dispatcher serves a distinguishable member of a class, persons in need of emergency services. Consequently, emergency dispatchers serve an identifiable class of persons, while police officers serve the general public.

Thus, as a member of an identifiable class of persons, those in need of emergency medical attention, Plaintiff must now show that Defendant owes a special duty to Plaintiff as a result of the special relationship between the two parties as one who is in need of emergency medical assistance and one who is able to provide emergency medical assistance.

### Did Defendant Owe Plaintiff a Special Duty?

The method for determining whether a government entity or employee owes its residents a special duty based on the dynamics of the relationship between the two is unsettled in Virginia. The common law of Virginia has not adopted a particular standard by which to resolve negligence claims against a government employee or official. This ambivalence toward establishing a specific standard, one would suspect, is due to the difficulty of defining the duties of government employees and, conversely, the ramifications of doing so.[4] Hence the parties in this case advance two different methodologies for determining whether a special relation exists between the Plaintiff and Defendant in this matter.

Plaintiff contends that the Court must analyze the totality of the circumstances of the night in question in order to discern the existence of a special relation between the Plaintiff and Defendant. *See* Plaintiff's Brief in Reply to Defendant's Special Plea, at 3 (Aug. 14, 2003), *citing Dudley*, 241 Va. at 279. The Defense, on the other hand, advocates a stricter, more

---

[4] When Virginia first adopted the public duty doctrine it acknowledged that "it would not be in society's best interest to impose liability upon a public official for the violation of his public duty to the citizenry at large, because to do so would expose him to litigation from all his official acts." *Marshall*, 239 Va. at 319.

methodical four-part test, first introduced in a New York case, to be the appropriate standard for examining the presence of a special duty. *Cuffy v. City of New York*, 69 N.Y.2d 255, 260 (1987), *as quoted in Linda Lee Corp. v. Covington Co.*, 36 Va. Cir. 590 (1993). Pursuant to the New York test, a court must analyze the following criteria to determine whether a special relation exists between the parties to create liability:

> (1) an assumption by local government entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured;
> (2) knowledge on the part of the local government entity's agents that inaction could lead to harm;
> (3) some form of direct contact between the local government entity's agents and the injured party; and
> (4) that party's justifiable reliance on the local government entity's affirmative undertaking.

*Linda Lee Corp.* 36 Va. Cir. at 594.

As one would expect, the two tests result in two different outcomes of liability and thus the Court must intervene and determine the appropriate special relation standard.

After comparing the standards promoted by the parties, the differences between the two seem insignificant. The New York test promoted by the Defendant is simply an explicit list of factors encompassed in the Plaintiff-endorsed totality of the circumstances test. The distinction between the two tests is not in the tests themselves but rather in the manner in which the tests are interpreted and applied. The Plaintiff invokes a broad and sweeping interpretation of the totality of the circumstances standard, while the Defendant restricts the New York test to very strict and narrow definitions.

The first factor of the New York test asks whether the local government entity assumed an affirmative duty to act on behalf of the injured party through promises or actions. *Linda Lee Corp.*, 36 Va. Cir. at 594. Such promises or actions include the adoption of local ordinances creating a duty to act, the nature of the acts made by the government entity and whether such acts were advertised throughout the community.

In this case, the City of Staunton assumed the responsibility of providing emergency services, including emergency medical, fire and protective services, for the benefit of its residents pursuant to Virginia Code §§ 27-23.1 and 27-6.1. To provide the most thorough and efficient emergency services the City of Staunton implemented an emergency system predicated on the

emergency 911 system. The emergency system utilized emergency personnel to receive emergency calls for dispatch of police, fire, or emergency medical service personnel. Furthermore, the City of Staunton notified its residents of the emergency response system via its telephone books, banners on police and emergency vehicles, and public telephones. Provided this information, it is evident that the City of Staunton assumed responsibility for the emergency care of its residents upon which its residents relied. Such reliance between an entity of the local government and its residents satisfies the first prong of the New York test.

The second element of the New York test is a knowledge requirement. Specifically, the test asks: to what extent does the local government entity's agent know that his inaction could create harm for the injured party? The knowledge element is directly related to the local government agent's job responsibilities. If the City Manager receives a call from a resident complaining that the trash was not collected on his street, inaction on the part of the City Manager, despite his knowledge of the situation, is an oversight, but it will not harm the aggravated resident. Conversely, if a firefighter receives knowledge that a residential house is ablaze, inaction by the firefighter would be irresponsible given his job duties and, worse yet, harmful to the residents affected by the fire.

Provided the information regarding the call made on the night in question, it is difficult to conclude that Defendant did not know that inaction on his part could lead to harm. Defendant received a call in which the caller, Mr. Clifton, provided Defendant with specific details of the alleged hit and run accident. Mr. Clifton expressed that he was "as serious as a heart attack" and continuously urged Defendant to investigate the scene of the crime. Plaintiff's Motion for Judgment at 2 (Feb. 3, 2003). In deference to the Defendant, the Court must recognize the inconsistent statements of Mr. Clifton; Mr. Clifton reported that there was blood on the *inside* of the car that allegedly hit Plaintiff, as well as the suspicious context of the call (the call was received at approximately 2:00 a.m. on August 25, 2001, and Mr. Clifton refused to provide his name to Defendant). Nevertheless, at the very least, Mr. Clifton made Defendant aware that a car accident had occurred at a specific location; that blood had been left on the car thus indicating an injured victim and the need for emergency medical personnel. Given this information, the Defendant knew or should have known that his failure to act could lead to harm. Hence, Defendant meets the second criteria of the New York test.

Third, the New York test requires some direct contact between the local government entity's agent and the injured party. *Linda Lee Corp.*, 36 Va. Cir. at 594. Emergency 911 calls are often made through anonymous third-party

callers requesting emergency assistance on behalf of someone else. It would be unreasonable for 911 dispatchers to require a man suffering from a heart attack or a baby choking on a spoon to request emergency services directly. Thus, a more reasonable method for examining whether a special relation exists between a local government entity and an injured party is to require some direct contact between the local government entity's agent and the injured party *or* an agent of the injured party.

Under this revised third element of the New York test, Mr. Clifton's call to Defendant constitutes direct contact with the Plaintiff. As mentioned above, Mr. Clifton called Defendant to inform him of a suspected accident involving a car and a pedestrian; that pedestrian was the Plaintiff in this case who eventually died as a consequence of the accident. Mr. Clifton, acting as an anonymous agent of Plaintiff spoke directly with Defendant, provided Defendant with as much information as possible, and begged Defendant to investigate the accident further. Given the circumstances of the accident (Plaintiff was most likely unconscious, far from phone access, and badly injured), it is unreasonable to require Plaintiff to make direct contact with Defendant. Thus, pursuant to the practical application of the New York test, the Court holds that Defendant had sufficient contact with the Plaintiff to satisfy the third prong of the special relation test.

Finally, the fourth factor of the New York test asks whether the injured party was justified in relying on the local government entity's affirmative undertakings. *Linda Lee Corp.* 36 Va. Cir. 594. To determine whether the injured party was justified in relying on the local government entity, the Court must ask whether the local government entity held itself out as a provider of particular services. If the inquiry is answered in the affirmative, then the injured party is justified in relying on the entity.

As mentioned above, the City of Staunton created its emergency response system to benefit those residents in need of emergency assistance. It adopted an emergency system that has been adopted across the country to provide a uniform, well-known, and easily understandable emergency system. The City of Staunton also chose to employ emergency dispatchers to facilitate the prompt, accurate, and thorough response of emergency service providers. As such, these dispatchers are an integral link in the chain of emergency services. By taking these steps, the City of Staunton held itself out as a provider of emergency services. It is reasonable to expect Staunton residents to rely on the City's emergency services when in need of assistance.

On the night of August 25, 2001, Plaintiff, a resident of Staunton, needed emergency assistance. He had been struck by a car that failed to render assistance to him. His suspected location was on a dark road with little traffic.

It is safe to assume from the blood reported on the car in which Mr. Clifton was a passenger, Plaintiff was injured. It is reasonable to assume that had Plaintiff had the opportunity, he would have called 911 to request emergency assistance because he was aware of the emergency system implemented by Staunton. Furthermore, as Plaintiff's agent, Mr. Clifton relied on Staunton's emergency services to render assistance to Plaintiff. In fact, according to the transcript of Mr. Clifton's phone call to 911, Mr. Clifton stated "Damn. I'm telling you, you better go check it out," to which Defendant replied "Okay. We'll do that. . . ." Plaintiff's Motion for Judgment, at 2 (Feb. 2, 2003). By this simple acknowledgment that Defendant would investigate the scene of the reported accident further, it is fair to say that Mr. Clifton relied on Defendant to render assistance to Plaintiff.

Provided this examination of the totality of the circumstances in a practical manner, it is evident that Defendant, through his words and actions, created a special relation with Plaintiff that obligated him to provide emergency services to him. Defendant worked for a local government entity which assumed the duty to provide its residents with emergency response services. Defendant had adequate information to alert him that inaction on his part could create harm to Plaintiff. Mr. Clifton, on behalf of Plaintiff, contacted 911, spoke directly to Defendant and requested assistance from Defendant to aid Plaintiff, who Mr. Clifton correctly suspected was injured. In response to Mr. Clifton's request, Defendant stated that he would investigate the incident. Finally, provided the gravity of the situation, it can be reasonably assumed that Plaintiff would have called 911 to request assistance had he been able to do so because, like most citizens of Staunton in need of emergency services, Plaintiff relied on Staunton's emergency services.

Based on the foregoing analysis, the Court overrules the defendant's Special Plea of the Public Duty Doctrine.